IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWESTERN BELL | § | |
| TELEPHONE COMPANY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:14-CV-1409-K |
| | § | |
| V247 TELECOM LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Plaintiffs' Motion for Partial Summary Judgment Against

V247 Telecom LLC and Saving Call LLC (Doc. No. 75).  After careful consideration

and review of the motion, the response, the supplemental response, the reply, the

supporting appendices, the applicable law, and summary judgment record, the Court

**GRANTS** Plaintiffs' motion for the following reasons.

## I.    Factual and Procedural Background

Southwestern Bell Telephone Company, BellSouth Telecommunications, LLC,

Illinois Bell Telephone Company, Indiana Bell Telephone Company, Incorporated,

Michigan Bell Telephone Company, The Ohio Bell Telephone Company, Nevada Bell

Telephone Company, Pacific Bell Telephone Company, and Wisconsin Bell, Inc.

(collectively "Plaintiffs") filed this lawsuit against Defendants V247 Telecom, LLC, Saving Call, LLC, EZ Fone, LLC, EZ Network, LP, LN Enterprises, LLC, Mr. Lan Ngo, and Mr. Khai Ngo for allegedly failing to pay originating switched access service charges for international and interstate long-distance telephone calls using Plaintiffs' telecommunications network.

"Local exchange carriers" ("LECs") are local telephone companies that provide traditional land-line phone service.  LECs typically serve a small local service area covering a few local "exchanges," which are designated by the first three numbers of a seven-digit phone number.  Plaintiffs are incumbent local exchange carriers ("ILECs"), meaning they operated as monopolies in certain areas until the Telecommunications Act of 1996 ("1996 Act") opened the market to competition, allowing different carriers to serve the same exchange area.  These different carriers are known as competitive local exchange carriers ("CLECs") since they compete with ILECs.

Land-line calls placed and received within a local service area are "local calls". When a local call involves two LECs, whether incumbent or competitive, both carriers incur costs for the local call because the caller's carrier originates the call and the receiver's carrier transports and terminates the call.  Under the 1996 Act, carriers must enter into "reciprocal compensation agreements" for these local calls.  These

agreements require the caller's carrier to compensate the recipient's carrier for its costs in transporting and terminating local calls.

In addition to facilitating local calls, local phone networks are also needed to originate and terminate long-distance calls, whether interstate or international.  For traditional long-distance calls, a caller directly dials a long-distance number then the LEC serving that caller routes it to the caller's long-distance carrier.  This process is known as "originating access".  The caller's long-distance carrier then routes the call the LEC serving the recipient of that call, and that LEC completes the call by routing it to the recipient of the call.  This process is known as "terminating access".  Because long-distance calls cannot normally be completed without originating and terminating access from an LEC, the long-distance carriers must order "access services" from the LEC, regardless of whether it is an incumbent or competitive carrier.  The long-distance carrier incurs access charges from the LEC for this access services.  The LEC serving the caller is entitled to "originating switched access charges" from the long-distance carrier for that call.  The LEC serving the recipient of the long-distance call is entitled to "terminating switched access charges".  This case involved "originating switched access charges."

In addition to traditional direct dial, long-distance calls can also be made using prepaid calling cards which function essentially the same way as traditional long-

distance calls.  With prepaid calling cards, the caller typically dials a toll-free number (also known as an 8YY number) to become connected to the prepaid calling card provider's platform, and then the provider transmits the call to the recipient in another state or country.  Use of the toll-free number alerts the originating LEC that switched access charges are applicable.  Defendants V247 Telecom LLC ("V247") and Saving Call LLC ("Saving Call") provide long-distance phone service through prepaid calling cards, which allow their customers to pay in advance for long-distance calls.   But the cards offered and sold by Defendants V247 and Saving Call use local access numbers, instead of a toll-free number, to connect the caller to the prepaid calling card's platform.  Once the customer is connected to the calling card platform through the local access number, the customer then dials the actual long-distance number he would like to reach.  When a local access number is used, the LEC is unaware that the destination of the call is a long-distance area, and that the call may terminate in a long-distance area.  Therefore, an LEC is not alerted that a switched access charges applies when a prepaid calling card customer uses a local access number, as it would be when a toll-free number is used.

Plaintiffs filed this suit against Defendants alleging a violation of federal tariffs. Plaintiffs claim Defendants owe unpaid switched access charges to which Plaintiffs are entitled by federal law and tariffs for the interstate and/or international calls

originating on Plaintiffs' ILEC networks using the local access numbers provided on Defendants' prepaid calling cards.  Plaintiffs contend Defendants are evading payment of switched access charges by disguising the long-distance calls their customers are making as local calls through the use of local access numbers.  Plaintiffs filed the instant motion for partial summary judgment against Defendants V247 and Saving Call as to their liability for originating switched access charges on their prepaid long-distance calls originating on Plaintiffs' networks.

## II.  Legal Standard and Applicable Law

### A.  Standards for Summary Judgment

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant, and all disputed facts resolved in favor of the nonmovant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boudreaux v. Swift Transp. Co., Inc..*, 402 F.3d 536, 540 (5th Cir. 2005).

The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-25. Once the movant satisfies his burden, the nonmovant must present competent summary judgment evidence showing a genuine fact issue for trial exists. *Id.* at 321-25; *Anderson*, 477 U.S. at 255-57. To meet this burden, the nonmovant may not rest on the pleadings, but must designate specific facts in the record establishing a genuine issue of material fact exists. *Celotex*, 477 U.S. at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc). The nonmovant may satisfy this burden by providing depositions, affidavits, and other competent evidence; not with "conclusory allegations, speculation, and unsubstantiated assertions." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence cannot defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-52; *Boudreaux*, 402 F.3d at 540. If the nonmovant fails to make a sufficient showing to prove the existence of an essential element to the case and on which the nonmovant will bear the burden of proving at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322.

"Even if there is a dispute regarding some material facts, a movant may obtain summary judgment if he can prove there is no evidence to support one or more

essential elements of the non-moving party's claim." *Walker v. Geithner*, 400 F. App'x

914, 916 (5th Cir. 2010)(per curium)(citing *Celotex*, 477 U.S. at 323-25).  However,

"[i]t is not sufficient to merely list the elements of the claims and state that there is

no evidence to support the elements." *Seastruck v. Darwell Integrated Tech.*,

Civ. No. 3:05-CV-0531-BF, 2008 WL 190316, at *3 (N.D. Tex. Jan. 22, 2008)

(Stickney, M.J.).  The movant must cite to the record to demonstrate a lack of

evidence that supports the nonmovant's claims.  *Id.*

## B. Applicable Law

### 1. Telecommunications Act of 1996

The 1996 Act amended the Communications Act of 1934, and served to open

up local telephone markets to competitive local exchange carriers ("CLEC").

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, at Part II

(1996).  Prior to the 1996 Act, local telephone markets were monopolies of each

incumbent local exchange carrier ("ILEC").  The 1996 Act allowed CLECs to enter

the market and acquire new telephone numbers to distribute to their customers,

which gave customers the option to receive their local exchange service from CLECs

rather than just ILECs.  *See* 47 U.S.C. § 251(b)(2); *In re Implementation of the Local*

*Competition Provisions in the Telecomms. Act of 1996, Interconnection between Local Exch.*

*Carriers & Commercial Mobile Radio Serv. Providers*, 11 F.C.C.R. 15499, 15509 ¶ 16, n.

11 (1996).  This also applied to prepaid calling card providers, which enabled CLECs to offer local telephone numbers to prepaid calling card providers so their customers could initiate prepaid calling card calls on local numbers.  *Id.*

The 1996 Act also ensured that a CLEC's customer could make local calls to an ILEC's customer by requiring CLECs and ILECs to enter into interconnection agreements to govern the mutual exchange of calls between their networks. 47 U.S.C. § 251(a)(1).  This arrangement is referred to as "reciprocal compensation agreement."  Section 251(b)(5) of the 1996 Act applies to the relationship among both CLECs and ILECs and creates a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."  47 U.S.C. § 251(b)(5).  All traffic is subject to Section 251(b)(5) unless specifically carved out by Section 251(g) which provides that telecommunications traffic is not governed by reciprocal compensation if:  (1) the traffic is to a long-distance carrier or information access provider; and (2) the traffic was subject to an equal access and non-discriminatory interconnection restriction or obligation that pre-dates the 1996 Act.

## 2.  FCC 2006 Order

Acting under its powers vested by the Communications Act, the Federal Communications Commission ("FCC") issued a declaratory order on June 1, 2006 address which addressed, among other things, the applicability of access charges for

calls made using prepaid calling card services.  *In re Regulation of Prepaid Calling Card Servs.*, 21 FCC Rcd. 7290, 7290 (2006), *vacated in part on other grounds*, *Qwest Servs. Corp. v. FCC*, 509 F.3d 531 (D.C. Cir. 2007) ("2006 Order").  The 2006 Order initially dealt with the classification of two types of "enhanced" prepaid calling cards—menu-driven prepaid calling cards and prepaid calling cards that utilized Internet Protocol technology.  The issue before the FCC was whether the cards were telecommunications services or information services.  *Id.* at 7291.  This distinction would determine whether the prepaid calling card providers that sold these two types of cards were required to pay access charges to the LECs that originated the calls, as well as whether they would have to contribute to the Universal Service Fund ("USF").  *Id.* at 7290.  The FCC held that both types of prepaid calling cards were telecommunications services so those providers were subject to access charges and USF contributions.  *Id.* at 7290.  The FCC also stated that in light of these findings and prior findings, all prepaid calling card providers would be treated as telecommunications service providers.  *Id.*

The FCC then went further and set forth rules applicable to all prepaid calling providers.  *Id.* at 7298.  The FCC found interim rules necessary "to provide regulatory certainty and ensure compliance with [the] existing access charge and USF contribution requirements while [the FCC] consider[ed] broader reform of [the]

rules." *Id.* If such rules were not in place, the FCC was concerned that it would "create incentives for providers to reduce exposure to charges they may owe or evade them altogether." *Id.* at 7293.

### 3. Tariffs

To collect charges pursuant to a tariff, the party must demonstrate that: (1) it operates under a federally filed tariff; and (2) it provided services to the customer pursuant to that tariff. *Advamtel, LLC v. AT&T Corp.*, 118 F.Supp.2d 680, 683 (E.D. Va. 2000).

Under the Communications Act of 1934, later amended by the 1996 Act, every common carrier must file "schedules" (hereafter "tariffs") with the FCC "showing all charges" and "showing the classifications, practices, and regulations affecting such changes." 47 U.S.C. § 203(a); *see also Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000). Further, a carrier may not lawfully "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule." 47 U.S.C. § 203(c)(3); *see also Evanns*, 229 F.3d at 840. Tariffs define the legal relationship between a common carrier and its customers and consist of the terms and conditions on file with the FCC. *Am. Tel. & Tel. Co. v. City of N. Y.*, 83 F.3d 549, 552 (2nd Cir. 1996). Moreover, "federal tariffs are the law, not mere contracts."

*MCI Telecomms. Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992); *see also Am. Tel. & Tel.*, 83 F.3d at 552 (filed tariffs "have the force of law and are not simply contractual."); *Carter v. Am. Tel. & Tel. Co.*, 365 F.2d 486, 496 (5th Cir. 1966)("[A] tariff, required by law to be filed, is not a mere contract.  It is the law.").

Once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to "conclusively and exclusively enumerate the rights and liabilities" as between the carrier and the customer.  *Am. Tel. & Tel. Co. v. N.Y. City Human Res. Admin.*, 833 F.Supp. 962, 970 (S.D.N.Y. 1993); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2nd Cir. 1998).  Customers are charged with notice of the terms and rates on file with the FCC and "may not bring an action against a carrier that would invalidate, alter or add to the terms of the filed tariff."  *Evanns*, 229 F.3d at 840. Furthermore, tariffs properly filed with the FCC are public records.  *Katz v. MCI Telecomms. Corp.*, 14 F. Supp.2d 271, 274 (E.D.N.Y. 1998).

## III.   Analysis

Initially, the Court notes that this case is substantially similar to two previously addressed by the Court: *Southwestern Bell Tel. Co. v. Touch-Tel USA, LLC*, Civil Action No. 3:10-CV-1642-P ("*Touch Tel* case") and *Southwestern Bell Tel.Co. v. IDT Telecom, Inc.*, Civil Action No. 3:09-CV-1268-P ("*IDT* case").  Although the arguments are virtually identical, the Court will address the specific facts at issue in this case to

determine whether the traffic at issue renders Defendants V247 and Saving Call liable for the switched access charges Plaintiffs seek.

### 1. Is V247 a Telecommunications Provider?

At the outset, the Court addresses Defendant V247's argument that there is a genuine issue of material fact as to whether V247 is even a telecommunications provider.  Defendant V247 argues "it was a marketing and customer service agent for [Defendant] Saving Call" which was a telecommunications provider.  The Court disagrees and finds that the summary judgment record does not support V247's argument.

Plaintiffs met their summary judgment burden by identifying evidence in the summary judgment record that shows the absence of a genuine issue of material fact on this issue.  *See Celotex*, 477 U.S. at 322-325.  This competent summary judgment evidence includes: (1) V247's admissions in its original answer that it provides "long distance phone service through prepaid calling card services, which allow, among other things, a customer to pay in advance for long-distance calls"; (2) their website which holds V247 out as a telecommunications provider operating with an FCC license; and (3) a signed "Outsourcing Agreement" between V247 and Saving Call which included, among other things, an agreement between Saving Call, which held

an FCC license, that V247 would operate as a prepaid calling card provider, although it did not have an FCC license.

Defendant V247 was then required to present competent summary judgment evidence establishing a genuine issue of material fact exists. *Id.*  V247 asserts that although there is a signed Outsourcing Agreement, that agreement "was never implemented or followed."  There is nothing more than the conclusory statements that this agreement was never followed.  Furthermore, V247's statement that it was simply a "master distributor" or "marketing agent" does not, without more, create a genuine issue of material fact as to whether V247 was a telecommunications provider. V247 wholly fails to address the admission made in its original answer that it provides telecommunications services or that its website holds V247 out as telecommunications provider.  The Court finds V247 did not satisfy its burden on summary judgment to create a genuine issue of material fact as to whether it is a telecommunication services provider such that it would be liable for access charges. *Douglass*, 79 F.3d at 1429 (conclusory allegations and unsubstantiated assertions do not satisfy this burden).  The Court finds the summary judgment record establishesV247 is a telecommunications provider.

The Court will address Plaintiffs' motion for partial summary judgment as to V247 as well as Saving Call.

### 2. The 2006 Order

In determining Defendants' liability for access charges, the first issue to be decided is whether the FCC's 2006 Order governs the traffic at issue. As the Court has previously noted in the *Touch Tel* and *IDT* cases, this determinative issue is a purely legal question—more specifically, whether the FCC's interim rules set forth in the 2006 Order apply to prepaid calling card providers that use local numbers to access their platforms, such as those sold by V247 and Saving Call, thereby entitling Plaintiffs to switched access charges.

In its motion for partial summary judgment, Plaintiffs claim that the 2006 Order applies to all prepaid calling cards, not simply the two types of calling cards specifically mentioned (menu-driven prepaid calling cards and those using Internet Protocol). This includes, according to Plaintiffs, the type of calling cards offered by Defendants which use local numbers to access the provider's platform, and which qualify as telecommunications services. Because the 2006 Order recognizes access charges apply to all prepaid calling card providers, Plaintiffs argue Defendants V247 and Saving Call are responsible for access charges.

Defendants argue that the language of the 2006 Order is narrow and addresses only the two specific types of prepaid calling cards at issue in the 2006 Order, both of which rely on toll-free numbers. V247 and Saving Call state that the 2006 Order

does not extended to "all" prepaid calling cards, despite Plaintiffs' argument to the contrary.  Defendants also direct the Court to the Arizona Dialtone Petition as evidence about the uncertainty about the application of the 2006 Order requirements to locally dialed prepaid calling cards.  V247 and Saving Call also contend that reciprocal compensation controls the traffic at issue because this involves locally dialed calling card traffic, and allowing Plaintiffs to recover access charges would be compensating them twice.

The Court agrees with Plaintiffs' interpretation of the 2006 Order, as it has done twice before in both the *IDT* and *Touch Tel* cases. The Court again finds the language used in the 2006 Order important to note.  The FCC specifically found that two specific types of prepaid calling cards (menu-driven and Internet Protocol) offer telecommunications services, therefore "these providers are now subject to all of the applicable requirements of the Communications Act and the Commission's rules, including requirements to contribute to the federal USF and to pay access charges." *In re Regulation of Prepaid Calling Card Servs.*, 21 FCC Rcd. at 7298.  The FCC also stated that in light of these findings and prior findings, all prepaid calling card providers would be treated as telecommunications service providers.  *Id.*  The FCC then went further and set forth rules applicable to all prepaid calling providers.  *Id.*.  The FCC found interim rules necessary "to provide regulatory certainty and ensure

compliance with [the] existing access charge and USF contribution requirements while [the FCC] consider[ed] broader reform of [the] rules." *Id.*  If such rules were not in place, the FCC was concerned that it would "create incentives for providers to reduce exposure to charges they may owe or evade them altogether." *Id.* at 7293.

As the Court has twice previously determined, the 2006 Order provides courts with interim rules applicable to "all prepaid calling card providers," and until the FCC provides further guidance, all prepaid calling card providers are to be treated as telecommunication service providers and subject to access charges as detailed in the 2006 Order.  Defendants V247 and Saving Call have presented no competent summary judgment evidence to persuade the Court differently.  Prepaid calling card providers who rely on local numbers, such as Defendants V247 and Saving Call, are responsible for access charges.  The Court acknowledges that interested third-parties have argued that the 2006 Order does not apply to the facts in this case and that Arizona Dialtone, Inc. submitted a petition seeking guidance concerning the 2006 Order and its applicability to prepaid calling card using local numbers obtained by the card provider from a CLEC. *Arizona Dialtone Inc. Petition for Reconsideration*, WC Docket 05-68 (Aug. 31, 2006).  As the Court has twice noted before, there has been no action or further guidance issued by the FCC in relation to this issue.  Therefore, the Court finds this argument is without merit.

V247 and Saving Call's argue that their prepaid calling cards involve only CLEC-served calling card traffic, therefore access charges do not apply because these are simply local calls.  They argue that reciprocal compensation applies to this traffic.  This argument is also without merit.  Simply because a third-party is placed in the middle of the calling card traffic does not mean the end destination is within the local area and not to a long distance area and that Defendants V247 and Saving Call should not be held responsible for the access charges.  Reciprocal compensation usually controls the traffic between the LECs, whether incumbent or competitive;  but, just as the Court previously determined in the *Touch Tel* and *IDT* cases, the traffic at issue here involves more than the traffic between Plaintiffs and CLECs.  In making their arguments to the Court, Defendants V247 and Saving Call look at the traffic in isolated parts.  The Court must examine the traffic as a whole in its analysis.  If the traffic was truly only between Plaintiffs and the designated CLECs used by Defendants, then reciprocal compensation would govern.  Again this traffic involves more than local traffic.  Defendants V247 and Saving Call allow their prepaid calling card customers to make long-distance or international phone calls by dialing a local access number V247 and/or Saving Call obtained from CLECs.  The summary judgment record establishes that the traffic at issue is clearly subject to access charges.

Simply because a third-party is placed in the middle of the calling card traffic does not mean these Defendants should not be held responsible for the access charges, The 2006 Order's interim rules state "all" prepaid calling cards that provide telecommunication services are subject to these rules.  The calling cards at issue here, just as in the *IDT* and *Touch Tel* cases, provide telecommunications services.  The summary judgment record establishes that Plaintiffs, unbeknownst to them, are originating long-distance phone calls through the use of local numbers by Defendants' customers, and Plaintiffs are not receiving the switched access charges to which they are entitled.  For this reason, the interim rules apply to the traffic at issue in this case.

Defendants also argue that Plaintiffs "may not overturn industry standards of rating calls based on the telephone numbers dialed."  In other words, V247 and Saving Call argue Plaintiffs may look only to the codes of the calling and called parties (collectively, "NPA-NXX codes") to determine the call's destination, not the actual geographic locations of the calling and called parties.  Use of the industry practice of comparing the NPA-NXX codes is made difficult by calling cards, such as the ones at issue here, which use local numbers to allow the customer to access the provider's platform from which he then places the long-distance call.  These types of prepaid calling cards make it appear that the call is placed from and terminated in the same local area when that is not what truly happens.  In an attempt to find a solution

to this problem, the FCC provided for certification and reporting requirements that compel the prepaid calling card provider to share the necessary information with the LEC that it uses to transport traffic to and from the platform.  *Id.* at 7300.  So Defendants' arguments that Plaintiffs are attempting to overturn industry standards is meritless.

Defendants V247 and Saving Call also argue that the "carve out" provision in Section 251(g) of the 1996 Act does not apply to the traffic at issue in this case.  The Court disagrees.  First, the Court has already determined that the traffic at issue is to a long-distance provider since it is destined for long-distance or international locations.  Second, the 1996 Act provides that local exchange carriers shall "provide exchange access . . . in accordance with the same equal access and non-discriminatory interconnection restrictions and obligations (including receipt of compensation) that apply" prior to the 1996 Act.  47 U.S.C. § 251(g).  "Exchange access" is defined as "the offering of access to telephone exchange services or facilities for the purpose of the origination and termination of telephone toll services."  47 U.S.C. § 153(20).  The 1996 Act defines "telephone toll service" as "telephone services between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service."  47 U.S.C. § 53(55).  The Court has already determined the nature of the traffic, which is that the traffic originates with

Plaintiffs through use of local access numbers then terminates in a different exchange area.  Further support of the true nature of this traffic is the fact that Defendants' customers are using a prepaid calling card to make the call.  The use of these prepaid cards suggests, if not evidences, that the call truly is long-distance and is not covered under their contracts with Plaintiffs which are their local carriers.  Based on the summary judgment record, the Court finds Section 251(g) clearly applies to this traffic.

Defendants V247 and Saving Call argue that even if the traffic at issue could fall within the Section 251(g) exception, Section 251(g) ultimately cannot apply because they did not have "a specific compensation agreement with a long-distance carrier or information service provider" prior to the 1996 Act.  This same argument has been rejected by the Court twice before, and is so rejected in this opinion.  The traffic in this case cannot be viewed in a vacuum of traffic simply between the ILEC to CLEC; it must be viewed as the entire transaction.  With traditional "basic" prepaid calling cards, those card providers must pay the LECs who originate and terminate the call access fees.  In this case, when the entire call is examined, rather than simply one part, it is clear that Plaintiffs are originating long-distance phone calls without receiving the access charges to which they are entitled.  And simply putting a third-

party, Defendants' CLECs in this case, in the middle does not change Defendants' obligation to pay those access charges.

Based on the forgoing analysis, the Court finds reciprocal compensation does not govern this traffic, instead the 2006 Order applies.

### 3. Tariffs

"To collect charges pursuant to a tariff, Plaintiffs must demonstrate: (1) that they operated under a federally filed tariff; and (2) that they provided services to a customer pursuant to that tariff." *Advamtel*, 118 F.Supp.2d at 683.  There is no dispute that Plaintiffs operate under a federally filed tariff.  The parties do dispute whether Plaintiffs provided services pursuant to their tariffs.  Plaintiffs argue they clearly provided Defendants V247 and Saving Call with the services set forth in their filed tariffs.  Defendants V247 and Saving Call contend the traffic at issue is not covered by Plaintiffs' tariffs and therefore, as a matter of law, the tariffs do not apply. The Court disagrees with Defendants and, for the following reasons, finds that one or more of Plaintiffs' tariffs apply to the traffic at issue.

Plaintiffs allege Defendants V247 and Saving Call received services as detailed in Section 6.1 of their Southwestern Bell Telephone interstate tariff ("SWBT Tariff"). Section 6.1 of the SWBT Tariff addresses "switched access service" and substantially similar versions of the tariff are found in all of Plaintiffs' interstate tariffs.  Switched

access service is defined as "a two-point communications path between a customer's premises through the use of common terminating, common switching, Switched Transport facilities, and common subscriber plant of the Telephone Company."  The access "customer" is "any" entity "which subscribes to the services offered under this tariff, including . . . Interexchange Carriers."  An "end user" is defined as "any customer of an interstate or foreign telecommunications service that is not a carrier."

The summary judgment record establishes this SWBT Tariff covers Defendants V247 and Saving Call's conduct.  Applying the SWBT Tariff to the facts at hand, the access "customers" are Defendants V247 and Saving Call (the interexchange carrier) and the "end user" is the customer of Defendants V247 and Saving Call who is using the prepaid calling card.  V247 and Saving Call obtained a "two-point communications path" from its retail end users to Defendants' "premises" in order to send the call to its long-distance destination.  Plaintiffs originated each call and took the call from the end user to the CLEC designated by Defendants V247 and Saving Call's, which acted as the middleman.  The CLEC's network can be characterized as the "premises" of Defendants V247 and Saving Call, because that was the designated point for Plaintiffs to deliver its calls.  If Plaintiffs did not provide this path, Defendants V247 and Saving Call would have been unable to receive any calls originating from the end user "premises" on Plaintiffs' networks.  Plaintiffs are an

essential part of the traffic and should be compensated for their role.  Because of that, the SWBT Tariff applies to this traffic at issue.  It also appears that other tariffs may apply to the conduct of Defendants V247 and Saving Call.

Defendants V247 and Saving Call allege that the SWBT Tariff does not apply to this situation because they receive services from third-parties, the CLECs, and because Defendants V247 and Saving Call are not an "end user" as referenced in Plaintiffs' tariffs.  The Court rejects this argument, just as it did in the *Touch Tel* and *IDT* cases.  The Court is not persuaded by Defendants V247 and Saving Call's argument that the Plaintiffs' tariffs cannot apply because the prepaid calling card traffic is served by third-party CLECs from which Defendants V247 and Saving Call receive local service.  The use of third-party CLECs is simply an attempt to avoid paying access charges.  The summary judgment record supports a finding that the "switched access services" tariff applies.

The Court must also determine whether Plaintiffs' services were ordered by Defendants V247 and Saving Call in order for them to be liable for access charges.  A party can "order" such service, thereby becoming a "customer" in two ways:  (1) by affirmatively ordering the service by pre-subscribing to the service; or (2) by constructively ordering the service.  *Am. Tel. & Tel. Co.*, 83 F.3d at 553 (citing *United Artists Payphone Corp. v. N.Y. Tel. Co.*, 8 F.C.C.R. 5563, 5566 (1993)).  There is no

dispute that Defendants V247 and Saving Call did not affirmatively order services. Therefore, Defendants V247 and Saving Call can be held liable only if they constructively ordered the access service described in Plaintiffs' tariffs.

A party constructively orders a carrier's services when "the receiver of the services:  (1) is interconnected in such a manner that it can expect to receive access services; (2) fails to take reasonable steps to prevent the receipt of access services; and (3) does in fact receive such services." *Advamtel*, 118 F. Supp.2d at 685.  "In order to find that a service has been constructively ordered, the carrier must show 'affirmative action . . . to establish a [customer] relationship.'" *Id.* (citing *Am. Tel. & Tel. Co.*, 83 F.3d at 553-54).  This affirmative action includes the failure to "take reasonable steps" to avoid receiving the carrier's services.  *Id.*

Defendants V247 and Saving Call contend that they have not constructively ordered services.  Defendants V247 and Saving Call argue that they are not "interconnected" with Plaintiffs because that requires the physical linking of two networks, not simply the transport and termination of traffic.  Defendants V247 and Saving Call also allege that by ordering services from CLECs, they affirmatively acted to prevent receipt of access services by Plaintiffs.

The Court disagrees.  Courts have found the constructive order doctrine may be applicable to an interexchange carrier even when the interexchange carrier is not

directly connected to the LEC.  *See Alliance Comm'cns v. Global Crossing Telecomm.*, 690 F.Supp.2d 889, 894-95 (D.S.D. 2010).  Furthermore, the Court finds that Defendants V247 and Saving Call did not take reasonable and affirmative steps to prevent receipt of the services despite their argument to the contrary.  The Court finds Defendants V247 and Saving Call appear to have simply added an additional step by purchasing local access number services from CLECs in order to avoid access fees.  Ordering services from the CLECs does not suggest any affirmative action to prevent receipt of services from Plaintiffs.  This is especially true since Defendants V247 and Saving Call must have known that not all calls placed by their prepaid calling card customers would originate on CLEC-served phone lines and that CLECs would not own all the facilities used to make the call.  It seems reasonable that Defendants V247 and Saving Call knew that other companies, such as Plaintiffs, would be needed to originate some of the calls and, therefore, Defendants V247 and Saving Call would be liable for access charges.   Finally, Defendants V247 and Saving Call did in fact receive the services specifically described in Plaintiffs' tariffs. Therefore, the Court finds the three elements of constructive ordering have been established.  The summary judgment record establishes that Defendants V247 and Saving Call constructively ordered Plaintiffs' services.  *See Advamtel*, 118 F. Supp.2d at 685.

A fact issue remains as to when Plaintiffs knew or should have known about the traffic at issue here as well as whether Plaintiffs sustained damages.  The issue of damages and whether Plaintiffs are entitled to an injunction will be addressed at trial.

## IV.    Conclusion

The Court finds Defendants V247 and Saving Call are liable for payment of originating switched access charges to Plaintiffs for international and interstate long-distance telephone calls originated by Plaintiffs on their networks.  For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for partial summary judgment.

**SO ORDERED.**

Signed September 15th, 2016.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 26